

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00070-CV

IN THE INTEREST OF B.N.H. AND
J.D.H., CHILDREN

----------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant K.A.H. (Mother) appeals the trial court's judgment terminating her parental rights to two of her children, B.N.H. and J.D.H. In one issue, Mother argues that the evidence is legally and factually insufficient to support the trial

---

[1]*See* Tex. R. App. P. 47.4.

court's finding that termination of her parental rights is in the children's best interest.[2] We affirm.

## II. Background

At the time of trial, B.N.H. was four years old, and J.D.H. was one year old. J.C.O. is the alleged biological father of B.N.H., and M.D. is the alleged biological father of J.D.H. Neither of the children's fathers attended the trial, nor are they parties to this appeal. Mother testified that she had last seen M.D. while she was pregnant with J.D.H. but did not know how to contact him. Mother testified that she had not seen J.C.O. since B.N.H. was one year old and did not know how to contact him either.

Mother testified that she has four children. Her oldest child, S.L.M.Y., is eleven years old and has lived with her grandparents since she was one year old. Mother's youngest child is D.D.G. Mother's boyfriend R.J.G. is D.D.G.'s biological father, and D.D.G. was about four months old at the time of trial. Neither S.L.M.Y. nor D.D.G. is involved in this case.

Mother testified that she lives in her stepmother P.H.'s home in Fort Worth with P.H. and R.J.G. A friend of Mother's was also living in the home at the time of trial but did not plan to stay permanently. Mother testified that she and the

---

[2]Mother does not challenge the sufficiency of the evidence to support the trial court's findings under family code section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O), and (P) (West Supp. 2012). We therefore do not address them. *See* Tex. R. App. P. 47.1.

children would live in P.H.'s house with her, P.H., and R.J.G. if the children were returned to her. The house has three bedrooms.

Mother testified that she and R.J.G. had been in a relationship for approximately two years. Mother testified that R.J.G. was in jail at the time of trial for a probation violation and that the underlying offense was theft. Mother testified that she wanted R.J.G. to be around the children after he was released from jail. Mother acknowledged knowing that R.J.G. had served time in the penitentiary but did not know how many times he had been in jail or the date of his convictions.[3] She testified, though, that R.J.G. was changing for the better for her children.

Mother testified that she had smoked methamphetamine about two months before the trial but that she had not told R.J.G. about it because she believed he would leave her. Mother agreed that R.J.G. also had a history of smoking methamphetamine but testified that he had stopped. She also testified that R.J.G.'s positive drug tests were caused by amphetamines in his seizure medication. Mother denied that R.J.G. was smoking methamphetamine in addition to taking his seizure medication but recalled having attended a court hearing in which R.J.G. may have testified that he was still using drugs.

Mother admitted that her youngest child, D.D.G., had tested positive for methamphetamine at birth. Mother testified that B.N.H. and J.D.H. were

---

[3]Mother also testified that P.H. had served time in the penitentiary years earlier for selling drugs but that P.H. no longer used drugs.

3

removed from her care on April 3, 2012, and that she used methamphetamine "every day" between their removal and D.D.G.'s birth on October 14, 2012. Mother testified that she believed her children were removed from her in April 2012 because of the drugs in her and R.J.G.'s system. She and R.J.G. both tested positive for methamphetamine at the time and both admitted methamphetamine use.

Mother acknowledged that the Department had done the right thing by placing B.N.H. and J.D.H. in foster care. She testified that she had twice proposed her brother as a placement for all three of her youngest children but had been told no, and Mother admitted that she did not know her brother's last name and had not seen him in about a year.

Mother testified that she had received a family service plan after the children were removed and that she had started drug rehabilitation about a month before trial. Mother had also been to Recovery Resource for a drug assessment just before her children were removed. Recovery Resource recommended inpatient treatment for Mother because she was pregnant with D.D.G. at the time, but Mother did not undergo inpatient treatment. Recovery Resource recommended outpatient treatment for R.J.G., but he did not seek drug treatment.

Mother has not participated in individual counseling; Mother testified that she had called but that Merit Family Services "blew [her] off for a long time." Mother testified that she was unable to do all the things being asked of her

4

because of R.J.G.'s incarceration, P.H.'s health issues, and her own head injury and brain surgery. Mother admitted, however, that she had not asked her caseworker for transportation assistance and testified that she did not know she could ask for that type of help. Mother also testified that neither she nor R.J.G. had participated in parenting classes as required by the service plan.

Mother's service plan also required weekly visits with the children, and Mother complained about being asked to arrive very early for the visits. Mother agreed, though, that she had been asked to arrive early because of how often she had been late. Mother testified that it was difficult for her to arrive on time for visits because of how tired she was; she had been working very hard to clean P.H.'s house in order to get her children back. In that regard, Mother identified three color pictures of P.H.'s house that were taken the day B.N.H. and J.D.H. were removed. Mother admitted that the home was full of boxes, that there was a "trail" between the boxes to walk through, and that she and R.J.G. had been sleeping in the living room because that was the only empty room. Mother agreed that the home was not a safe place for her children at the time but testified that she had cleaned it up since the pictures were taken.

Mother testified that her brain surgery was eight years earlier, that she had been hit on the head with a whiskey bottle, and that she had bleeding on her brain. Mother testified that she has, since that time, suffered from memory loss and migraines and that her health issues have affected her ability to complete her service plan. Mother testified that she is not able to proactively complete the

5

tasks in her service plan because of her brain injury, that she needs someone to push her along through the process, and that she would like more time to do what is needed to get her children back. Mother testified that she talks with her biological mother and her brother occasionally but that she does not have many family resources available to her. P.H. helps however she can but has her own limitations.

Mother testified that she cannot get a job because she has difficulty comprehending the tasks assigned to her. She also testified that she cannot read or write because of a learning disability. She completed the eighth grade in school but never learned to read. When she had her children, she received WIC and food stamps, but she does not currently have a job or any bills that she is responsible for paying. Even so, Mother testified that she has the mental ability to care for her children and that she would apply for medication and government assistance to help her with her disability and financial situation. Mother testified that she had not tried to do that in the past because she was "messed up on drugs." Mother also testified that she knew her children had been removed because of her drug use and not because of her disability.

Mother denied having ever used drugs in front of B.N.H. but also testified that she would not want her children to be in the care of someone with a long history of drug abuse. Mother admitted that she was herself a drug user, but she testified that she was trying to improve for her children, that she absolutely does not want to lose them, and that she wants to do right by them. Mother testified

that she wants to stop using drugs and that she understands how important it is for her and her children for her to stop. Mother also testified that if she had to, she would choose her children over R.J.G. even though she loves R.J.G. very much. Mother testified that she needs serious help and that she would do whatever the Department wanted her to do to get her children back, including inpatient rehabilitation.

Tonyia Brown testified that she is the Department conservatorship worker for B.N.H. and J.D.H. She is also assigned to the separate case involving D.D.G. Brown testified that she agreed with Mother's testimony about Mother's lack of progress toward completing the service plan. Brown also testified that the Department had determined just prior to removal of the children that there was reason to believe that the children had been neglectfully supervised by Mother and R.J.G. and had been physically neglected by Mother, R.J.G., and P.H.

Brown testified that B.N.H. and J.D.H. are doing "really well" in their current foster placement, that the children are healthy and do not have behavioral problems, and that the Department planned for the children to be adopted by one of the foster parents. Brown testified that Mother's ongoing drug use and inability to provide a safe and stable living environment were concerning to her and that the foster parents could provide a safe home and care for the children's emotional and physical needs. The Department also has programs available to assist the foster parent if adoption were granted in the future.

7

Brown agreed that Mother appears to love her children and that Mother had not, to her knowledge, beaten the children, given them drugs or alcohol, or left them alone in the street. Brown admitted having not recently seen the home where Mother lives and thus did not know whether Mother had cleaned it, but Brown testified that Mother's drug use was the primary reason that justified termination of Mother's parental rights. Brown also testified that, except for the drug use, Mother could be a good mother to the children. In response to a question by the trial court to Brown, Brown stated that Mother's last positive drug test was January 8, 2013, the month before the termination trial.

## III. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 & n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.* at 563; *Holick*, 685 S.W.2d at 20–21.

8

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001, § 161.206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination is in the child's best

9

interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth

10

of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Best Interest of the Children

Mother argues in her sole issue that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

11

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

In a consolidated argument, Mother contends that the evidence concerning the children's best interest is legally and factually insufficient. She argues that there is no evidence concerning the children's desires and that there was insufficient evidence concerning the children's emotional and physical needs now and in the future or concerning the stability of her proposed home for the children. Mother points to evidence that she had been in drug rehabilitation for a month prior to trial, that she had been visiting the children, and that she had two bedrooms available in P.H.'s home for the children to live. We note that there is

12

also evidence that Mother had worked to clean up P.H.'s home and that Mother expressed during her testimony that she would do whatever was necessary to get her children back.

While the evidence that Mother relies on is favorable to her, it reveals only a recent improvement in her potential ability to parent the children. In that regard, the factfinder is not required to ignore a long history of irresponsible choices simply because the behavior abated as trial approached. *See In re J.O.A.*, 283 S.W.3d 336, 346–47 (Tex. 2009) (providing that even significant evidence of improved conduct, especially in short duration, does not conclusively negate the probative value of a history of irresponsible choices); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (providing that evidence of a recent turnaround should be determinative only if it is reasonable to conclude that the positive improvements will surely continue). Here, Mother's testimony and the pictures of P.H.'s home from the time of the children's removal establish that P.H.'s home was filthy and so cluttered that the rooms had only a trail between boxes to walk from room to room and that the kitchen sink was unusable because of the debris piled on top of it. Mother also admitted that she and R.J.G. had used methamphetamine and that she had smoked methamphetamine every day between April 2012 and October 2012. Indeed, D.D.G. was born with methamphetamine in his system, and Mother tested positive for methamphetamine just weeks before the termination trial. *See In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *9–10 (Tex. App.—Fort

13

Worth Feb. 9, 2006, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support best-interest finding and noting dirty condition of home, the mother's continual drug abuse, and the mother's failure to complete service plan). Moreover, Mother initially testified that she planned for the children to live in P.H.'s home with her, P.H., and R.J.G. But R.J.G. was in jail at the time of trial as a result of a theft conviction, had previously served time in the penitentiary for a felony conviction, and had not completed any of the tasks assigned to him by the service plan. *See In re M.L.S.*, No. 11-12-00042-CV, 2012 WL 2371042, at *4–5 (Tex. App.—Eastland June 21, 2012, no pet.) (mem. op.) (holding best-interest evidence legally and factually sufficient and noting the mother's testimony that it was in the children's best interest to live with the mother and the mother's boyfriend, who had a criminal and CPS history). Mother also did very little toward completing her service plan and admitted that doing so was difficult for her because of her brain injury, learning disability, and responsibilities of caring for herself, R.J.G., and P.H. *See T.D.L.*, 2006 WL 302126, at *9 (noting in best-interest analysis the mother's failure to complete her service plan other than attending a few parenting classes).

In contrast to Mother's history with the children, the evidence reflects that the foster parents caring for the children have a safe, stable home and wish to adopt the children. The children are healthy, have no behavioral problems, and are doing well in the foster home.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is such that the factfinder could reasonably form a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See J.P.B.*, 180 S.W.3d at 573. We also conclude, viewing all the evidence in a neutral light, that the factfinder could reasonably form a firm conviction or belief that termination is in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence supporting the trial court's best-interest finding is legally and factually sufficient to support the judgment, and we overrule Mother's sole issue.

## V. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DELIVERED: August 1, 2013

15